**KINLOCH TELEPHONE CO. et al. v. LOCAL UNION NO. 2 OF INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS et al.**

(Circuit Court of Appeals, Eighth Circuit. June 27, 1921. Rehearing Denied October 29, 1921.)

No. 5721.

Injunction ⬤=136(2)—Employer held entitled to preliminary injunction to restrain threatened interference with contracts of employees.

Complainant, a company which operates an extensive system of telephone and telegraph lines in both intrastate and interstate commerce, and which has accepted the provisions of the Post Roads Act July 24, 1866 (Rev. St. § 5263 et seq. [Comp. St. § 10072 et seq.]), and constructed its lines on streets and other post roads, having both union and nonunion employees, entered into a contract for a stated term with its employees, who were members of certain unions, which recognized the open shop policy of complainant, and by which it was agreed that any grievances should be taken up by complainant and a committee of the employees, to be selected by their union, and on failure of adjustment should be submitted to arbitration. During the term defendant union and the individual defendants, none of whom were employees of complainant, undertook to compel it to unionize its business, which they openly threatened to do. In pursuance of such plan they ordered a strike of their members, in violation of their contract, and attempted by persuasion, inducements, and threats, and even by assaults, to compel other employees to violate their contracts, and threatened to cause strikes by members of all other unions. *Held*, that on such facts, clearly shown, complainant was entitled to a preliminary injunction, and that the granting of such injunction was not prohibited by Clayton Act Oct. 15, 1914, § 20 (Comp. St. § 1243d).

Appeal from the District Court of the United States for the Eastern District of Missouri; Charles B. Faris, Judge.

Suit in equity by the Kinloch Telephone Company and another against local Union No. 2 of the International Brotherhood of Electrical Workers and others. From an order denying their motion for a preliminary injunction, complainants appeal. Reversed.

For opinion below, see 265 Fed. 312.

Appellants filed a complaint in the court below for the purpose of enjoining appellees from inducing the employees of appellants from breaking their contract with appellants. A motion for a temporary injunction was made by appellants, and the same was heard on the complaint and other evidence submitted by both parties. The motion was denied, and appellants appeal. The facts which are largely undisputed are substantially as follows: Appellants are corporations of the state of Missouri, and have their principal offices in the city of St. Louis. Appellee Local Union No. 2 of the International Brotherhood of Electrical Workers is an unincorporated society located at St. Louis, having as its members certain employees of appellants, as well as certain employees of other firms, corporations, and individuals at the same place. It is a branch or local of the International Brotherhood of Electrical Workers, which is a labor organization, national in character, having various subordinate locals in various cities, towns, and villages of the United States. Appellee McSpadden is secretary of the Conference Board of said International Brotherhood of Electrical Workers, appellee Givens is business agent of said Local No. 2, appellee Thompson is vice president of said local, appellee Knoll is financial secretary of said local, and other appellees are members of the executive board of said local. All of appellees reside in the state of Missouri, and have their offices in St. Louis. Locals Nos. 309 and 649 of the

International Brotherhood of Electrical Workers are referred to in the evidence, but are not parties to this action. In addition to the above locals the International Brotherhood of Electrical Workers maintains a department known as Telephone Operators' Department of the International Brotherhood of Electrical Workers, and in St. Louis there are six local unions of this department. None of the appellees who are referred to by name are or ever have been employees of appellants, or either of them. Appellant Kinloch Telephone Company, hereinafter for convenience herein referred to as the Kinloch Company, operates telephone exchanges and a telephone system in the states of Missouri and Illinois, and also operates local telephone exchanges at St. Louis, Mo., and in other places in the vicinity of St. Louis and East St. Louis and other places in the state of Illinois. In St. Louis and vicinity the Kinloch Company has in its local exchange more than 40,000 stations, and in St. Clair county, Ill., has more than 5,000 stations. Its subscribers at such stations are business and manufacturing institutions, banks, offices, residences and other places where telephones are usually installed and maintained, and a large majority of its subscribers at said stations have no other means of telephone communication, except through the telephones of the Kinloch Company. The Kinloch Company also supplies private telephone exchange service to the Post Office, Jefferson Barracks, and other governmental agencies at St. Louis. More than 30 per cent. of the business of the Kinloch Company is interstate in character, and consists of the transmission of telephone messages from one state of the United States to other states thereof.

Appellant Kinloch Long Distance Telephone Company of Missouri, hereinafter for convenience herein called the Long Distance Company, operates long distance and toll lines in the states of Indiana, Illinois, Missouri, Kansas, and other states, and also owns and operates local telephone exchanges in the states of Missouri and Illinois. The telephone lines of the Kinloch Company and of the Long Distance Company are connected, and each of said companies also connects with other telephone systems, and by virtue of said connections a vast system of telephone lines are connected together, whereby persons in many states of the United States can communicate by telephone in interstate traffic with persons in other states of the United States. A large proportion of the business of the Long Distance Company is interstate in character. In addition to the telephone lines owned and operated as above, the appellants also own and operate telegraph lines and particularly furnish private telegraph lines to various persons. With the exception of the telegraph line of appellants from St. Louis, Mo., to Kansas City, Mo., all of the telegraph lines of appellants are interstate in character and are used almost exclusively for the transmission of interstate telegraph messages.

Appellant Long Distance Company is the owner of all of the capital stock of the Kinloch Company, and while the telephone plants of the appellants are independently owned, yet as a practical proposition they are operated as one unified system, and employees of one of appellant companies are accustomed to and do perform work and labor for the other of said companies, and vice versa. This is particularly so in the exchange and lines of the appellants at St. Louis and vicinity. The distribution of the expense of labor, etc., is a matter of bookkeeping and accounting between the two companies. At St. Louis, Mo., the employees of appellants are employed by the Kinloch Company, although as above stated they are accustomed to and do perform work and labor for the Long Distance Company. In order to keep their telephone lines, instruments, and other facilities in proper working order and repair, in order to keep their appliances in proper condition for practical telephone service, and in order to install new facilities, it is necessary for appellants to keep in their employ a large number of linemen, cable splicers, testers, troublemen, and helpers. At St. Louis, Mo., in the proper conduct of its business, at the time of the controversy herein set forth, it was necessary for appellants to keep approximately 150 of such employees, in order to properly keep their telephone appliances and facilities in proper repair, and in order to install new facilities and appliances, and to do other work in connection with the telephone system in order that the appellants might properly carry out and perform their duties as common carriers in both intrastate and interstate

commerce. At the times mentioned, in order to fully perform such duties, appellants, necessarily required 150 employees in these departments and also required a large number of telephone operators to handle the transmission of both intrastate and interstate messages. At the time in question, of such 150 employees, some were members of the International Brotherhood of Electrical Workers and some were not, and at said times some of appellants' operators were members of the Telephone Operators' Department of said union and some were not. This was in accordance with the open shop policy of appellants which had been maintained by them for many years and which, as hereinafter shown, was maintained by agreement with the International Brotherhood. Each of appellants at all of the times in question was subject to the provisions of the Interstate Commerce Act of the United States, each was engaged to a great extent in Interstate Commerce, and each had, long prior to the times in question, accepted and were subject to the provisions of the act of July 24, 1866, and known as the Post Roads Act, and each had, long prior to the times in question, filed with the Postmaster General of the United States of America, their written acceptance of the restrictions and obligations required by law, and thereby became entitled to exercise the powers and privileges conferred by said Post Roads Act, and became subject to the liabilities and duties imposed upon them by virtue thereof. Under and by virtue of the laws of the United States, among other things, all letter carrier routes established in any city or town for the collection and delivery of mail matter are declared to be post roads, as well as all public roads and highways while kept and maintained as such. More than 75 per cent. of the telephone and telegraph lines of each of appellants are located on streets in towns and cities, which streets are letter carrier routes, or are located upon public roads and highways which are kept and maintained as such. Under and by virtue of said Post Roads Act appellants have the right to construct, maintain, and operate their line through and over any portion of the public domain of the United States, and over and along any military or post roads of the United States, and over, under, or across the navigable streams or waters of the United States. It is also provided by said Post Roads Act that any company which has filed its written acceptances of the provisions thereof with the Postmaster General, which shall by its agents or employees refuse or neglect to transmit messages, as provided by said act, shall be subject to a penalty. The Post Roads Act (Comp. St. § 10072 et seq.) also provides that any company that has accepted the provisions thereof shall so operate its lines as to provide equal facilities to all without discrimination in favor of or against any person, company, or corporation whatever. Heavy penalties, both of a criminal and a civil nature, are imposed by the Post Roads Act against any company which has accepted the act and which violates the provisions thereof.

On or about July 1, 1919, a dispute existed between the Kinloch Company acting for itself and for the Long Distance Company, and certain of its employees who were members of said Local No. 2, as well as certain of its employees who were members of Locals Nos. 309 and 649. After various conferences a written agreement was entered into between the appellant Kinloch Company, representing itself and the Long Distance Company, and the employees of said companies who were members of said locals. At the same time a similar agreement was entered into between appellants and its employees who were members of the Telephone Operators' Department of the International Brotherhood. In each case the agreements were witnessed by James J. Barrett, a conciliator of the Department of Labor of the United States. Said agreements were substantially the same, except as to working conditions. They provided that no discrimination or coercion should be exercised by appellants against any appellees because of their membership in the brotherhood, and that the rights of employees to peacefully solicit employees to become members of said locals, and to exercise fully freedom of speech in the union's behalf, was conceded by appellants, except during working hours. The agreements conceded the question of the open shop policy of appellants. In said agreement all of the working conditions for the period of the contracts were agreed upon, and the question of wages was to be submitted to a

board of arbitration, as provided by said agreements, and, when said board of arbitration had determined upon the wages, that the wages fixed by them should become a part of the agreements for the periods thereof. Such a board was afterwards agreed upon, and made an award as to wages, which was accepted by all of the parties and became a part of the agreements, and wages were paid as provided by said arbitration. The written agreement with the men who were members of the International Brotherhood provided that in case of grievances the company, meaning the appellants, agreed to meet a committee of employees selected by their locals, and that in case of the company and the committee of employees failing to agree in the adjustment of any grievances, then a board of arbitration should be appointed, one arbitrator to be appointed by the company and one by the committee, and in case of disagreement said two arbitrators should mutually agree upon a third, and, failing to agree upon a third within 15 days, then the appellants and the committee should each select new arbitrators, and the same procedure should be followed. An important part of the agreement was that, pending decision of the board of arbitrators, there was to be no stoppage of work on the part of the employees or lockout on the part of the company. It was further provided that the findings of the board of arbitrators should be conclusive on the questions affecting said agreements. Appellants' employees, who were members of said local union, and who were represented in the signing, of said agreement, had full knowledge of the terms, conditions, and covenants, resumed work under and by virtue of the provisions thereof, and thereby became parties to and bound by the terms of said written agreement entered into by their representatives as aforesaid. The agreement was to be in full force and effect for a period of one year from August 1, 1919, and thereafter until terminated by either party upon 30 days' written notice in advance. Work was resumed under such agreements and for a long period of time, or until January or February, 1920, appellants and the said local unions worked together under said agreement in peace, harmony, and satisfaction. On January 30, 1920, a meeting of said Local Union No. 2 was held, at which a vote was taken and carried to the effect that the business agent, to wit, appellee Givens, should have the power to take men off the job of the Kinloch Company whenever he saw fit. On January 26th, one Jennings, who was not and never had been an employee of appellants, and who was not a member of any committee of employees, called upon Mr. Reber, president and general manager of appellants, and asked for a conference between himself, appellee Givens, appellee McSpadden, and Mr. Reber. Mr. Reber told them that he was busy at that time, but would meet them upon Friday. Jennings requested an earlier date, whereupon Mr. Reber agreed upon 11 o'clock on Wednesday, which was two days after this meeting. Mr. McSpadden and Mr. Givens called at the time mentioned; Jennings did not come with them. They stated that they had called to take up some matters with Mr. Reber in connection with the men. Mr. Reber asked them what they were, and they told him, and he stated to them that he would investigate the matter and let them know what he found out, and made an engagement for them to return Friday at 11 o'clock. They returned Friday, and Mr. Reber told them the result of his investigation of the question, stated to them that this method and manner of taking up the controversies was entirely contrary to the agreement; that it was improper, and if the men in the employ of appellants had any grievances whatever they should take them up in the regular manner provided for in the agreement; that is, by a committee of appellant's employees selected by the locals, and not by a committee of nonemployees. It appeared that the general complaint was as to whether appellants, or Reber as its general managing officer, would insist upon foremen paying their dues in the union. And as to whether one Moss, an employee of appellants, had induced an employee to quit the union. Mr. Reber explained to them that that would be contrary to the contract, and that he had no more right to force them to pay dues than he had to force them not to pay dues. Neither McSpadden, Jennings, nor Givens have at any time, ever been employees of these companies.

R. Morton Moss was general superintendent of appellants, and as such had charge of these men. After the first visit of the labor officials to Mr. Reber's office, Mr. Reber informed Moss of the statement that had been made to him, whereupon Moss called upon Jennings at his office in the Pontiac Building in St. Louis. It appears that Jennings told Moss that the complaint of the union was that appellants would not insist upon union members paying their dues, and insisted, not only that Moss should compel the payment of dues and back dues by members or former members of the union, but that he should force them to come back into the organization. Appellee Givens was also present a part of the time, and then stated that he had taken the job as business agent only temporarily; that he would probably have it for about six months, but that he was going to clean the job up, and was either going to put the men on the map or the Kinloch on the bum. Moss told Givens of the open shop agreement and stated to him that if he wanted to get the men into the organization that that was what he was being paid for; that that was not Moss' business, and he did not propose to interfere one way or the other; that he did not propose to force the men to join the union or keep out of the union. Givens also complained of some foremen's meetings held by Moss, which it appeared were meetings of the different foremen for purposes of considering the method of handling work, material, the welfare of the men, and the carrying on of the work. Givens asked that he might be present at these foremen's meetings, so that he could take up with the foremen the question of joining the organization, but Moss replied that that would have to be done outside of working hours, and that he was not interfering with them either one way or the other. Givens also stated to Moss that he was going to see that appellants had a closed shop, and boasted to others that he was going to have Moss fired. After some conversation Givens stated to Moss that he would pull the job if they did not have a closed shop. This conversation occurred on January 28th. Starting with January 30th, a correspondence between officials of appellants and the International Secretary of the International Brotherhood of Electrical Workers began. The International Secretary was located at Springfield, Ill. The correspondence ended by a letter from the International Brotherhood of Electrical Workers dated February 28, 1920, closing as follows:

"Our conclusions concerning the situation are that there are sufficient reasons why members of the brotherhood should be removed from the company's properties. This decision, you will note, has not been hastily reached, and is only arrived at after a very thorough impartial investigation of the merits of the grievances which the employees have.

"You are advised that the International Brotherhood of Electrical Workers is willing to meet representatives of the company for the purpose of adjusting the difficulty, and we trust that the trouble may be brought to an early and satisfactory termination without the necessity of extending the trouble to the operating department of the company. We will refrain from doing so until a reasonable opportunity has been accorded the representatives of the company to advise us of their future position concerning the matter."

On February 9th, appellee Givens called a strike of the employees who were members of the International Brotherhood and who were employed by appellants. Whereupon a large number of the employees who were members of Local No. 2 at St. Louis and Local No. 309 at East St. Louis quit work, while those who were members of Local No. 649 at Alton, Ill., declined to go out on a strike. In the meantime, the appellants continued to endeavor to arrange matters, and the correspondence continued with the international officers at Springfield, Ill., culminating in a visit at the request of the international officers of Mr. Moss to Springfield, at which time Mr. Ford, the International Secretary, admitted that there was no grievance, and if there was it should be taken up in the right way, and that the men had positively violated their agreement. Ford stated further that, while he had instructed the men to take a strike vote, yet he had given positive instructions not to pull off men until the international office had an opportunity of investigating the matter. However, after this conversation, which occurred after the strike

and before the filing of the complaint herein, came the letter from Ford, above referred to, in which he threatened to extend the strike to the telephone operators. In the meantime, at the request of the international officers, Mr. Moss stated that in his opinion all of the members, who desired and expected benefits accruing from their membership in the locals should pay their dues regularly and promptly as all other indebtedness. From the time that the strike was called there commenced on the part of appellees and other members of Local Union No. 2 a policy of threats, intimidation, persuasion, and violence, which disrupted the mechanical organization of appellants, caused it to lose a large majority of its mechanical employees, prevented them from keeping their lines in repair for interstate commerce, prevented them from installing new instruments, and new lines when required, and resulted in the loss of an immense amount of money to them and in a threatened loss of hundreds of thousands of dollars if the matter continued as it was at that time.

Appellee Givens called up Poole, a member of the Union at Alton, and told them to quit work. Poole replied that they were not going off; that this was not their trouble. Givens replied that they had better come off; that they were going to make appellants a closed shop, and if they did not come off, what were they going to do when the shop was burned out? Givens further started to abuse Superintendent Moss, calling him vile and profane names.

Wallace Kirkendall on February 9, 1920, was working in St. Louis for appellants, when he was approached by appellees Knoll and Arnold and one Schwartz, who was a member of the union. He was about to do some work when Knoll told him that he had better not go up there. Again, on February 25th, Roy Roberts, a member of the Union, told Kirkendall that he ought to get off of the job; that they were going to "get those" who were working if they did not. Roberts stated that some of the radical fellows were wanting to come out and get those who were working, but that he and a few of the others were trying to hold them down. Kirkendall, on March 1st, called up Roberts, and asked him when he was going back to work, and Roberts replied that he would not run the risk of getting his head broke. Kirkendall was further told that it was not only No. 2, but all of the union; that the grand officers had sanctioned the strike, and that it was only a matter of time until all of the men would be out on a strike.

Appellee Knoll went to the house of Alex. Moore and spoke to him in his woodshed, and said they were out for a closed shop; that he should go to the meeting and tell them where the company told him to report for work. Currie also telephoned appellee Knoll there was a bunch out in the Styx, with not a policeman within a mile or two—to get a car and four men and come out. Jack Gilbert, an employee of appellants, was slugged immediately after he left some of the strikers in a saloon.

Currie told Walter Duepner that he would be out of a job when they won the strike, and also tried to bribe him by offering him 10 per cent. strike benefits to quit. Other men were offered as high as 80 per cent. of their wages to strike.

Three strikers walked back and forth for an entire afternoon in the presence of William Lyons while he was working for appellants.

Charles H. Winnefeld, an employee of appellants, was told by Roy Roberts that the bunch were framing an attack on the foremen of appellants; that he had stopped it for a while, but later they were going to get them. Winnefeld also saw a group of strikers surround Foreman Bellar, and force him to quit. Appellees Knoll and Givens, in the presence of Parker, a foreman of appellants, ordered his men to "come down off that pole, take your tools off and report to the hall at once." Appellee McSpadden called Munden a scab, and chased him out of his house. H. Kirkendall and McLemore visited the house of Roy Chase, and tried to talk strike to him against his will. Owen Schulte called one Taubold a liar, and threatened to slap his face.

Givens and three others visited Frank Bellar, and said that as long as he continued to work three or four men would be constantly around, and would let the union people who lived in the neighborhood know about him, and it would then not be safe for him.

Jack Gilbert was waiting for a car on February 14th, when members of the union hit him, knocked him down, and kicked him, without giving him a word of warning. Those who had control of the strike and were directing the use of threats, intimidation, and assaults against appellants' employees had full knowledge of the contract between appellants and its employees, and knew that the course they were pursuing would cause the breach of that contract. Witnesses, who testified for the appellees, stated that personally they had no cause for complaint; that they went on a strike simply because they were ordered to by appellees, who were not employees of appellants, and that they had no personal grievances of any kind whatever. It further appeared conclusively by the evidence that there never was at any time during this controversy any dispute between appellants and any of their employees concerning terms, or conditions of employment. Finally, the situation became so bad, in view of the threats, intimidations, and violence that had been used, as above stated, in view of the fact that appellants were no longer able to fulfill their duties as common carriers of interstate commerce, in view of the fact that they were no longer able to enforce their contract with many of their employees, in view of the fact further that appellees were endeavoring to cause other mechanical employees to break their contract and were threatening to call out the telephone operators and thus completely stop telephone service, and in view of the conditions as above set forth, on March 2, 1920, appellants filed their complaint, asking for a preliminary restraining order, for a temporary injunction, and for a permanent injunction upon final hearing. It was stipulated upon the trial that all of the appellees were either insolvent or men of small means.

Bruce A. Campbell, of E. St. Louis, Ill. (William R. Orthwein, of St. Louis, Mo., and Edward C. Kramer and Rudolph J. Kramer, both of E. St. Louis, Ill., on the brief), for appellants.

John P. Leahy, of St. Louis, Mo. (Lena Frank, of St. Louis, Mo., on the brief), for appellees.

Walter H. Saunders, of St. Louis, Mo., filed a brief as amicus curiæ.

Before CARLAND, Circuit Judge, and LEWIS and COTTERAL, District Judges.

CARLAND, Circuit Judge (after stating the facts as above). We agree with the trial court that the contract between the appellants and their employees required arbitration of any dispute which the evidence may show existed between the appellants and their employees, and that the committee referred to in the contract was intended to be a committee on the part of the employees composed of employees of appellants, and not a committee of the local union to which said union employees of appellants might belong, or a committee composed of the members of the Conference Board of Local Unions, and that neither a proper construction of the contract nor in common fairness or reason is there any obligation on the part of appellants to pay the union dues of their employees, or to see that such dues are paid, or to discharge men who do not pay such dues, although it is clear that this is one of the chief ostensible reasons for calling the strike. We also agree with the trial court in finding that the strike was called in a studied and concerted effort on the part of appellees to unionize the business of appellants, or, in other words, to compel them to convert their business from an open shop into a closed shop. We further agree with the trial court that appellees, as members, officers and agents of the International Brotherhood of Electrical Workers and as individuals, are causing,

maintaining, and supporting the strike in question upon wholly feigned and insufficient grievances, with the aim and intent to compel appellants to unionize their business; that the result of such action upon the part of appellees has been to cause the contract existing between appellants and its employees to be breached by such employees without sufficient reason or excuse in law or in fact, and, further, that appellees threaten to cause other of appellants' employees to break their contract with them; and that appellees are seeking to attain the results above stated by advice, persuasion, and inducements, bottomed upon labor unionization and union obligations. The trial court was of the opinion upon the facts as stated that, laying aside section 20 of the Clayton Act (38 Stat. 738 [Comp. St. § 1243d]), the case of Hitchman Coal & Coke Co. v. Mitchell, 245 U. S. 229, 38 Sup. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461, clearly entitled the appellants to a temporary injunction, but it was of the opinion that the Clayton Act did not pass under judgment in the Hitchman Case, as that case, although decided three years after the Clayton Act took effect, was commenced seven years before that time. The form of relief asked for in the Hitchman Case, however, operates only in futuro, and the right to it must be determined as of the time of the hearing. Duplex Printing Press Co. v. Deering et al., 254 U. S. 443, 41 Sup. Ct. 172, 65 L. Ed. ——, decided by the Supreme Court January 3, 1921, and since the decision of the court below in the present case. Therefore the Supreme Court in the Hitchman Case must have considered the effect of the Clayton Act on that case. Light is thrown upon the Hitchman Case by the language used by Justice Brandeis in his dissenting opinion in the Duplex Case. He said:

"Unlike Hitchman Coal & Coke Co. v. Mitchell, 245 U. S. 229, there is here no charge that defendants are inducing employees to break their contracts, nor is it now urged that defendants threaten acts of violence."

The only inference to be drawn from this language is that the Hitchman Case established the law on the facts appearing therein, notwithstanding section 20 of the Clayton Act. We are therefore of the opinion, in view of the decision of the Supreme Court in the Duplex Case, that the trial court erred in holding that section 20 of the Clayton Act forbids the issuance of an injunction in the present case. In the Duplex Case it was decided that section 20 is limited to the employees affected regarding their own employment, and does not confer privileges upon all members of a labor organization to which they might belong. It was also decided in the same case, if we interpret the decision correctly, that while any one may quit their employment even though a contract exists, yet they may not peacefully persuade others to break their contracts in order to gain their ends, and the Clayton Act does not legalize such interference. The appellees, who were not employees of appellants, persuaded some of the employees under contract to break the same, were attempting to persuade others to do likewise, and threatened to have the telephone operators break their contract. The employees testified in this case that they had no dispute with their employers, and especially is this true in regard to the

women, who had a separate contract which appellees threatened that they would cause to be broken. The object and purpose of a temporary injunction is to maintain the status quo. The issuance of such an injunction generally rests in the sound discretion of the trial court, and that discretion will not be interfered with by an appellate court as to the facts, unless there has been a serious error committed in the consideration of the same.

The law, however, as at present established when applied to the facts herein stated, fully warrants the issuance of a temporary injunction. It is therefore ordered that the order appealed from be reversed, and the case remanded to the court below, with instructions to issue a temporary injunction in accordance with the views herein expressed.