### PORTLAND TERMINAL CO. v. FOSS et al.

#### (District Court, D. Maine, S. D.   July 29, 1922.)

#### No. 848.

Injunction ⟪⇒⟫60—Railroad Company held entitled to injunction against issuance of strike order.

Complainant railroad company, an interstate carrier, and its station employés, entered into a contract to be effective "until it is changed as provided herein under the provisions of the Transportation Act of 1920." Section 301 of said act provides that "it shall be the duty of all ·carriers and their * * * employés * * * to exert every reasonable effort and adopt every available means to avoid any interruption to the operation of any carrier growing out of any dispute between the carrier and the ·employés. * * * All such disputes shall be considered and, if possible, ·decided in conference. * * * If any dispute is not decided in such ·conference, it shall be referred by the parties thereto to the board which under the provisions of this title is authorized to hear and decide such ·dispute." A dispute having arisen, which was not settled in conference, it was submitted by the parties to the Railroad Labor Board, but pending ·decision by the board defendants, who were officers of the employés' organization, proceeded to take a strike vote, which resulted in favor of a strike. *Held*, that the right to resort to a strike to settle the dispute was ·waived by the contract accepting the provisions of the Transportation Act, ·and that on a showing that a strike would interrupt the operation of the road and cause irreparable injury, complainant was entitled to an injunction restraining defendants from ordering a strike.

In Equity.   Suit by the Portland Terminal Company against Thomas C. Foss and others.   On motion for preliminary injunction.   Granted.

William A. Connellan and Nathan W. Thompson, both of Portland, Me., for respondents.

Edw. W. Wheeler, of Brunswick, Me., and Chas. H. Blatchford and George E. Fogg, both of Portland, Me., for Maine Cent. R. Co.

HALE, District Judge.   The matter now before the court is a motion for a preliminary injunction, the purpose of which is to continue in force a restraining order heretofore granted.   This involves the consideration of the rights and duties of the parties under the Transportation Act of 1920 (41 Stat. 456).

The suit upon which the motion is based arises under the laws of the United States. The complainant is a carrier in interstate commerce, engaged in the operation of a railroad. The defendants are its employés; they are members of an organization known as the Brotherhood of Railroad Station Employés.

After setting out the usual formal and jurisdictional facts, the bill alleges that the United States Railroad Labor Board was duly established under the Transportation Act of 1920; that, under this act, these complainants' and defendants, acting under the name of the Brotherhood of Railroad Station Employés, entered into an agreement, effective December 16, 1921, and February 1, 1922, and with an addendum of March 8, 1922; that such agreement is still in force; that on March 21, 1922, the Brotherhood of Railroad Station Employés requested a conference with the complainant for revision of certain rules in the agreement; that on April 5, 1922, this conference was had between the complainant and the representatives of the Brotherhood; that the parties failed to reach an agreement, and failed to decide the dispute; there being no adjustment board, as provided in the Transportation Act, the Brotherhood of Railroad Station Employés referred the dispute to the United States Railroad Labor Board, under the provision of the Transportation Act; and in pursuance of the rules of practice of the Labor Board the plaintiff submitted its reply to the application; hearing was had thereon on June 21, 1922; said dispute was fully submitted to said Labor Board for its decision; up to the filing of the bill no decision had been rendered by the Labor Board upon the dispute; that, in conformity with the Transportation Act, the plaintiff has paid its employés, first, the wages or salaries established under federal control, as provided in section 312 of the act; second, it has paid its said employés in accordance with agreements made with its said employés or applicable decisions of the Labor Board under the Transportation Act, and it is now paying its employés in accordance with the decisions of the Labor Board effective July 1, 1922; these decisions are No. 1074 and No. 1028 and addendum No. 1 to decision No. 1028; that, on July 7, 1922, Thomas C. Foss, Chairman of Division 15, Board of Adjustment, Brotherhood of Railroad Station Employés, gave notice to the complainant, requesting it to restore the rates of pay that were in effect prior to the last-named decisions of the Labor Board, and in pursuance of this notice the complainant arranged for a conference with the representatives of the Brotherhood on July 17, 1922; that complainant is ready to confer with the defendants relative to the subject-matter of the request, and is ready to exert every reasonable effort and adopt every available means to avoid interruption of the operation of the railroad growing out of a dispute between these parties; that, pending such conference, William C. Dow, secretary of the board, with the approval of Thomas C. Foss, chairman, issued and distributed to the members of the Brotherhood of Railroad Station Employés, of Division No. 15, a strike ballot. It is alleged on information and belief that the Brotherhood held a meeting on July 14, 1922, at which a vote was taken, showing a large majority of the

membership of the Brotherhood voting "yes" on the question of calling a strike.

Complainant further alleges that this action of the defendants, as above set forth; was in derogation of the duty of the defendants, under the Transportation Act, to use every reasonable effort and adopt every available means to avoid any interruption of the operation of the railroad, and constituted a potential threat to interrupt such operation; that it constituted a substantial threat to interrupt the carrying of persons, property, and mail in interstate commerce and under the terms of the Transportation Act.

Complainant alleges, further, that it was the duty of the defendants to exert every reasonable effort and adopt every available means to avoid interruption of the operation of the railroad, and that it was their duty, under the agreement, to continue their work, until the agreement should be duly changed pursuant to the provisions of the Transportation Act, and that it was their duty to remain under their wages, as given by the Labor Board, and unless changed in any manner provided by the Transportation Act, and that the action of the defendants was in violation of their agreement and of the decisions of the Labor Board; that such strike ballot was in derogation of their agreement; that it was a threat to interrupt the carrying of persons, property, and the United States mails in interstate commerce, against the provisions of the Transportation Act.

In its bill, complainant further refers to the fact that there is now a strike of certain employés in the shop crafts, and that on July 11th the President of the United States issued a proclamation, which is made a part of the bill, directing all persons to refrain from all interference with lawful efforts to maintain interstate transportation and the carrying of the United States mail.

The complainant says that the action of the defendants threatens to cause the plaintiff irreparable injury in its contract and property rights and in its business as a carrier, and to interrupt the carrying of persons, property, and the United States mail in interstate commerce; that the plaintiff is without adequate remedy at law; and that this equitable proceeding is its only remedy.

The case is submitted upon an agreed statement of facts. As a part of the facts complainant refers to the agreement between itself and its employés, including these defendants, which agreement is, by its terms, to be effective "until it is changed as provided herein under the provisions of the Transportation Act of 1920." It offers the decisions of the Labor Board under this agreement and forming a substantial part of the agreement. It is assumed that the last of these decisions of the Labor Board somewhat reduces the wages of the defendants. The facts show a dispute duly submitted to the Labor Board, that no decision has been rendered in this dispute, and that at the present time the complainant is paying defendants wages in accordance with the decisions of the Labor Board, pending the settlement of the dispute.

Complainant says that the threatened strike order is in derogation of the Transportation Act and of the agreement which has been made

under that act. It urges that, the defendants having by their agreement put themselves under the Transportation Act, it is their duty to remain under the wages which the Labor Board has given them, in pursuance of their contract, until those wages are changed under the terms of the Transportation Act.

The learned counsel for defendants urge that a court of equity cannot by injunction, under the circumstances, prevent an individual, alone or in concert with others, from quitting the personal service of another, and that these employés were not bound to follow the method of settling disputes marked out by the Transportation Act, but at any time could abandon their contract under the statute and pursue the strike remedy. They say, further, that their contract had in fact been terminated. They point to the late decision of the Supreme Court, in American Steel Foundries v. Tri-City Central Trades Council, 257 U. S. 184, 42 Sup. Ct. 72, 66 L. Ed. ——, in which case, in speaking for the Supreme Court, Mr. Chief Justice Taft said:

"It is clear that Congress wished to forbid the use by the federal courts of their equity arm to prevent peaceful persuasion by employés, discharged or expectant, in promotion of their side of the dispute, and to secure them against judicial restraint in obtaining or communicating information in any place where there they might lawfully be. This introduces no new principle into the equity jurisprudence of those courts. It is merely declaratory of what was the best practice always. Congress thought it wise to stabilize this rule of action and render it uniform."

The opinion further proceeds:

" * * * We must have every regard to the congressional intention manifested in the act and to the principle of existing law which it declared, that ex-employés and others properly acting with them shall have an opportunity, so far as is consistent with peace and law, to observe who are still working for the employer, to communicate with them and to persuade them to join the ranks of his opponents in a lawful economic struggle. Regarding as primary, the rights of the employés to work for whom they will, and, undisturbed by annoying importunity or intimidation of numbers, to go freely to and from their place of labor, and keeping in mind the right of the employer incident to his property and business to free access of such employés, what can be done to reconcile the conflicting interests?

"Each case must turn on its own circumstances. It is a case for the flexible remedial power of a court of equity, which may try one mode of restraint, and if it fails, or proves to be too drastic, may change it. * * * * "

It will be seen that the judgment of the Supreme Court in this case was a declaration of the well-established rule that federal courts in equity could not by injunction prevent ex-employés of a company, against which a strike was declared, from using persuasions to induce employés, or would-be employés, to leave their employment; that such injunction was contrary to the inhibition of section 20 of the Clayton Act (Comp. St. § 1243d), which provides:

" * * * No such restraining order or injunction shall prohibit any person or persons, whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do, or from attending at any place where any such person or persons may lawfully be."

Many cases have been brought to my attention, decided before the Transportation Act was passed, where it has been held that courts

may not enjoin a man from quitting the personal service of another, either individually or in concert with others; that the right to quit work and to strike is a personal privilege, which cannot be prevented by injunctive process, and that this is true, even when a strike is made in violation of a service contract. Hopkins v. Oxley Stave Co., 83 Fed. 912, 28 C. C. A. 99; Delaware, L. & W. R. Co. v. Switchmen's Union (C. C.) 158 Fed. 541. In Arthur v. Oakes, 63 Fed. 310, 318, 319, 11 C. C. A. 209, 218 (25 L. R. A. 414), Mr. Justice Harlan, of the United States Supreme Court, speaking for the United States Circuit Court, said:

"Undoubtedly the simultaneous cessation of work by any considerable number of the employés of a railroad corporation, without previous notice, will have an injurious effect, and for a time inconvenience the public. But these evils, great as they are, and although arising in many cases from the inconsiderate conduct of employés and employers, both equally indifferent to the general welfare, *are to be met and remedied by legislation restraining alike employés and employers* so far as necessary adequately to guard the rights of the public as involved in the existence, maintenance and safe management of public highways. In the absence of legislation to the contrary, the right of one in the service of a quasi public corporation to withdraw therefrom at such time as he sees fit, and the right of the managers of such a corporation to discharge an employé from service whenever they see fit, must be deemed so far absolute that no court of equity will compel him, against his will, to remain in such service, or actually to perform the personal acts required in such employments, or compel such managers, against their will to keep a particular employé in their service. * * * The fact that employés of railroads may quit under circumstances that would show bad faith upon their part, or a reckless disregard of their contract or of the convenience and interests of both employer and the public, does not justify a departure from the general rule that equity will not compel the actual, affirmative performance of merely personal services, or (which is the same thing) require employés, against their will, to remain in the personal service of their employer."

The rights of these parties depend largely upon the Transportation Act of 1920, under which their contract was made.

This statute was passed some years after the Clayton Act, and with an evident intention to meet some questions raised by that statute. Congress clearly had public conditions in view, and took into consideration such suggestions as were made by Mr. Justice Harlan, to which I have alluded, that certain great evils "should be met and remedied by legislation restraining alike employés and employers." The act was clearly intended to cover the transportation field, and to regulate so far as possible, the relation between common carriers, engaged in interstate commerce, and other parties. It sought to protect the public by conferring on the Interstate Commerce Commission a very extensive control in the matter of rates and regulations. It imposed the duty on that Commission of establishing rates which would enable railroads to earn such a remuneration as the Commission might deem fair upon the value of the road property and public use. The statute sought further to regulate the relations between carriers and their employés, by establishing means for the adjustment of all matters of controversy; it protected carriers from extortionate demands of their employés, and employés from arbitrary conditions imposed by employers. It recognized the interest of the general public in transportation service and sought to protect it from disasters incident to an in-

terruption of the transportation business. It undertook to establish a working means for the settlement of labor disputes, without resort to strikes and other old methods.

The primary and titular purpose of the act is to "settle controversies between carriers and their employés." Section 301 provides:

"Sec. 301.—It shall be the duty of all carriers and their officers, employés, and agents to exert every reasonable effort and adopt every available means to avoid any interruption to the operation of any carrier growing out of any dispute between the carrier and the employés or subordinate officials thereof. All such disputes shall be considered and, if possible, decided in conference between representatives designated and authorized so to confer by the carriers, or the employés or subordinate officials thereof, directly interested in the dispute. If any dispute is not decided in such conference, it shall be referred by the parties thereto to the board which under the provisions of this title is authorized to hear and decide such dispute."

Congress had power to pass an act of this sort regulating rates. In Wilson v. New, 243 U. S. 332, 352, 353, 37 Sup. Ct. 298, 303, 304 (61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024), the Supreme Court held, Mr. Chief Justice White speaking for the court, that Congress had an inherent power to take action with reference to the settlement of disputes between parties by establishing the legislative standard of rules and of wages binding as a matter of law upon the parties; that—

"Whatever would be the right of an employé engaged in a private business to demand such wages as he desires, to leave the employment if he does not get them and by concert of action to agree with others to leave upon the same condition, such rights are necessarily subject to limitation when employment is accepted in a business charged with a public interest and as to which the power to regulate commerce, possessed by Congress applied and the resulting right to fix in case of disagreement and dispute a standard of wages as we have seen necessarily obtained."

In Ft. Smith & Western R. Co. v. Mills, 253 U. S. 206, 40 Sup. Ct. 526, 64 L. Ed. 862, the Supreme Court did not undertake to modify what I have quoted from the language of Chief Justice White. In the Transportation Act, Congress imposed no impossible burden upon the employés; it did not compel them to make a contract under the Transportation Act. Without doubt the law favors the settlement of disputes without resort to force.

In the Debs Case, 158 U. S. 564, 583, 15 Sup. Ct. 900, 906 (39 L. Ed. 1092), in speaking for the Court, Mr. Justice Brewer said:

"When the choice is between redress or prevention of injury by force and by peaceful process, the law is well pleased if the individual will consent to waive his right to the use of force and await its action."

In the case before me the employés made the agreement shown by the facts between the parties. It appears that these individuals did "consent to waive their right to the use of force," and to regulate their conduct by the act which was clearly intended to "settle" disputes, and not to project parties into the midst of a dispute and then leave them to adopt other methods of settlement.

It appears that, by their agreement in the case before me, the employés do expressly consent that the change in their working agree-

283 F.—14

ment made by the Labor Board should be made. The decision of the Labor Board appears to provide expressly that it should be incorporated in the existing agreement and become a part of said agreement. The employés, then, are under a distinct obligation, I think, to accept the decision of the Labor Board as a part of the working agreement which they have made.

I find nothing in the facts brought to my attention to lead me to the conclusion that the agreement has been terminated. The request for a conference on the part of the employés, in accordance with the provision of the agreement, indicates that the employés have not regarded the agreement as terminated, either by the decision of the Labor Board or in any other way. Of course, each employé has the right to quit the personal service of another, when he chooses; but the strike ballot was a clear challenge to the method of settlement marked out by the Transportation Act and adopted by the employés in their contract. The opinion of Mr. Chief Justice Taft, in the American Steel Foundries Case, to which I have already called attention, is not decisive of any question raised by the Transportation Act; it did not deal with any such question; it did not deal with any question involved in the Transportation Act. It was talking about the right of ex-employés to induce other employés by persuasion to leave their employment contrary to the Clayton Act. It distinctly held that each case must be adjudged upon its own circumstances, and referred to the flexible remedial power of a court in equity. There are many other cases, some of which have been brought to my attention by the learned counsel for defendants, where District Courts, since the passage of the Transportation Act, have upheld the power to strike, but without any reference to questions raised by the Transportation Act. Such a case is Birmingham Trust & Savings Co. v. Atlanta, B. & R. Railroad Co. (D. C.) 271 Fed. 743.

In leaving parties to their remedy under the Transportation Act, in pursuance of a contract signed by them, the court is not imposing a burden upon the parties; it is recognizing the position in which the parties have placed themselves. There are many instances where parties elect to proceed, under certain remedies and thereby waive their rights to other remedies. In cases where parties have proceeded in suits under the Employers' Liability Act (Comp. St. §§ 8657–8665), such parties are held to have waived their common-law remedy. In the case at bar, I think it must be held that these defendants have, by their contract, elected to have their rights adjudged under the Transportation Act, and to have referred their case to the Labor Board, with the understanding that such board is "to hear and decide the dispute." The rights of the defendants are, then, in my opinion, to be adjudged under the Transportation Act of 1920, in pursuance of which their contract is made.

With this view of the case, I am constrained to hold that the complainant has a right of action. Having such right of action, it is for the court to say whether, under the facts, an irreparable injury is shown and whether the complainants may be allowed to proceed by the injunctive method.

The Clayton Act provides that no injunction shall be granted by courts of the United States involving any dispute concerning terms of conditions of employment, "unless necessary to prevent irreparable injury to property, or to a property right." Comp. St. § 1243d; Duplex Co. v. Deering, 254 U. S. 443, 41 Sup. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196; Kinloch Telephone Co. v. Local Union Number 2 (C. C. A.) 275 Fed. 241. In the Duplex Case my attention is called to the terse and suggestive language employed by Mr. Justice Brandeis in his dissenting opinion:

"* * * The conditions developed in industry may be such that those engaged in it cannot continue their struggle without danger to the community. But it is not for judges to determine whether such conditions exist, nor is it their function to set the limits of permissible contest and to declare the duties which the new situation demands. This is the function of the Legislature, which, while limiting individual and group rights of aggression and defense, may substitute processes of justice for the more primitive method of trial by combat."

In passing upon the question of irreparable injury, we must recognize that the Legislature has attempted to "substitute processes of justice for the more primitive method." It appears by the statement of facts in the case at bar that the strike would seriously interrupt the operation of the Portland Terminal Company. An examination of the contract and of the whole case shows that a question is raised involving rights of the public. I think the court may well find that an irreparable injury would be done to the complainant and to the public by the issuing and carrying out of the strike order.

The Transportation Act marks out no method for its enforcement; it leaves this to the courts. No method has been brought to my attention by which the rights of the parties could be determined, except by a bill in equity, containing substantially such prayers as are found in the bill before me.

A temporary injunction is ordered as prayed for.